**AMERADA HESS PIPELINE CORPO-RATION, Arco Pipe Line Company, BP Pipelines Inc., Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Alaska Pipeline Corporation, Sohio Pipe Line Company and Union Alaska Pipeline Company, Appellants,**

v.

**ALASKA PUBLIC UTILITIES COMMISSION, Appellee.**

**No. S–521.**

Supreme Court of Alaska.

Jan. 3, 1986.

---

Louis R. Veerman, Mark E. Wilkerson, Ely, Guess & Rudd, Anchorage, for appellants Amerada Hess Pipeline Corp., BP Pipelines Inc., Exxon Pipeline Co., Sohio Pipe Line Co. and Phillips Alaska Pipeline Corp.

Albert S. Tabor, Jr., John E. Kennedy, Vinson & Elkins, Houston, Tex., David T. Andril, Vinson & Elkins, Washington, D.C., for appellant Amerada Hess Pipeline Corp.

Andrew E. Hoge, Hoge & Lekisch, Anchorage, Robert E. Jordan, III, Steven H. Brose, Timothy M. Walsh, Steven _ Reed, Steptoe & Johnson, Washington, D.C., H. Newell Williams, Gerald A. Costello, Long Beach, Cal., John T. Updegraff, Independence, Kan., for appellant ARCO Pipe Line Co.

Quinn O'Connell, Eugene E. Threadgill, R. Brian Corcoran, Maryann Armbrust, Connole & O'Connell, Washington, D.C., George H. Hagle, New York City, for appellant BP Pipelines Inc.

Richard J. Flynn, Eugene R. Elrod, Joseph B. Tompkins, Jr., Stephen S. Hill, Terence M. Hybes, Sidley & Austin, Washington, D.C., Kenneth P. Fountain, Clifton D. Harris, Jr., Barry R. Ogilby, Thomas A. Bannigan, Benjamin W. Hahn, Houston, Tex., for appellant Exxon Pipeline Co.

Bonnie Robson, Trefry & Brecht, Anchorage, Andrew J. Kilcarr, John P. Dean, Donovan Leisure Newton & Irvine, Washington, D.C., James R. Kinzer, Dallas, Tex., for appellant Mobil Alaska Pipeline Co.

Raymond N. Shibley, Brian D. O'Neill, LeBoeuf, Lamb, Leiby & MacRae, Washington, D.C., Glenn E. Davis, Bartlesville, Okla., for appellant Phillips Alaska Pipeline Corp.

John Lansdale, Jr., Phillip R. Ehrenkranz, Keith R. McCrea, Squire, Sanders & Dempsey, Washington, D.C., Robert A. Johnson, Frederick G. Wohlschlaeger, Cleveland, Ohio, for appellant Sohio Pipe Line Co.

John C. Siemers, Burr, Pease & Kurtz, Anchorage, C. Frank Reifsnyder, Patrick M. Raher, Hogan & Hartson, Washington, D.C., Anthony G. Melas, George C. Bond, Sam A. Snyder, Los Angeles, Cal., for appellant Union Alaska Pipeline Co.

Virginia A. Rusch, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

The Alaska Public Utilities Commission ("APUC") allocated nearly two million dollars in costs and attorney's fees incurred in the first six years of its Trans-Alaska Pipeline System ("TAPS") tariff investigation to the eight owners of the pipeline.[1] The superior court affirmed the award. We reverse and remand on the ground that the APUC had no authority to allocate costs incurred solely for work on the Federal Energy Regulatory Commission ("FERC") TAPS proceeding. We affirm the APUC's resolution of all other issues.

## I. BACKGROUND

The Alaska Pipeline Act (Act), AS 42.06, was enacted in 1972, creating the Alaska Pipeline Commission ("APC"). Ch. 139, § 1, SLA 1972. The APC was intended to perform two primary and distinct functions: "to regulate pipeline facilities and pipeline carriers" and "to represent the interests of the state in any proceedings relating to them as provided for in this chapter." AS 42.06.020 (repealed 1981). In 1981 the APC was abolished and its responsibilities were shifted to the already existing APUC.[2] Ch. 110, § 18, SLA 1981.

---

1. The TAPS owners ("owners") are: Amerada Hess Pipeline Corp., ARCO Pipe Line Co., BP Pipelines Inc., Exxon Pipeline Co., Mobil Alaska Pipeline Co., Phillips Alaska Pipeline Corp., So-hio Pipe Line Co., and Union Alaska Pipeline Co.

2. For simplicity, we use APUC to refer to both the APC and the APUC.

Most aspects of the APUC's duties relate to intrastate regulation of pipeline activity. AS 42.06.140. The APUC conducts its own investigations regarding "the rates, classifications, rules, regulations, prices, services, practices and facilities of pipeline carriers, and the performance of obligations under and compliance with the terms of leases issued by the state." AS 42.06.140(a)(2). The APUC may also initiate and intervene in proceedings before other administrative and judicial bodies in this state, whenever a pipeline carrier is involved and the state's interests are affected. AS 42.06.140(a)(7). In federal proceedings involving the interstate regulation of pipeline carriers, the APUC provides assistance to the Alaska Department of Law. AS 42.06.140(a)(10). Pursuant to AS 42.06.610, the APUC is authorized to allocate costs incurred in a "proceeding held under this chapter" among the parties to the proceeding, including the APUC.

The cost allocation order in the case at bar primarily involved costs incurred in the investigation of intrastate rates and tariffs for TAPS.[3] In November 1982, the APUC issued an initial order allocating $2,035,726.66 in total costs. Of that sum, $1,998,758.22 was allocated to the TAPS owners ("owners") and relatively nominal amounts were allocated to the State of Alaska and MAPCO Alaska, Inc. The order listed the type and amount of costs incurred in each proceeding, explained the rationale of the allocation, and detailed the procedure by which the APUC would consider objections. It invited the parties to audit APUC records and petition for reconsideration.

The owners subsequently audited the APUC records and petitioned for reconsideration. In its final cost allocation order, the APUC rejected most of the owners' objections, but agreed that some of the costs were unreasonable and nonallocable. After an unsuccessful appeal before the superior court, the owners brought this appeal. We review the APUC's final allocation order directly, without regard to the superior court's opinion. *See Jager v. State*, 537 P.2d 1100, 1106 (Alaska 1975).

## II. COST ALLOCATION REGULATIONS

The owners contend that both AS 42.05.151 [4] and due process require the APUC to adopt regulations governing the cost allocation proceeding. They assert that since the APUC issued no such regulations, the cost allocation order is invalid. We disagree.

### A. *AS 42.05.151*

The TAPS owners argue that AS 42.05.151(b) requires cost allocation regulations,

---

**3.** The order allocated costs incurred in six proceedings. The first proceeding was the original TAPS investigation beginning in November, 1976, and still ongoing at the time the order was issued. In that proceeding, the APUC staff investigated the rates, classifications, rules, regulations, prices, services, practices and facilities of the TAPS owners. The eight TAPS owners, the APUC staff, and the Alaska Public Interest Research Group (AKPIRG) were parties to that proceeding. The second one was Docket P–77–8, which was an investigation regarding the tariff filed by Exxon, in which Exxon, the APUC staff, MAPCO Alaska and AKPIRG were parties. The third one was Docket P–77–9, which involved a complaint Sohio filed with the FERC challenging the APUC's jurisdiction to set intrastate rates for TAPS. Sohio was the only party in this proceeding. The fourth one was a joint investigation of the tariffs filed by Exxon, ARCO, Sohio and Union, Dockets P–77–8, P–77–9, P–77–10, and P–77–11. These companies, as well as the APUC staff, the State of Alaska, MAPCO and AKPIRG were parties. The fifth

was the concurrent FERC-APUC hearings, Phase I and Phase II, in which the eight TAPS owners, MAPCO, the APUC staff, the State of Alaska, and AKPIRG (Phase I only) were parties. The sixth one was Docket P–78–5, which was an investigation of the tariffs filed by Amerada Hess, BP, Mobil, and Phillips. These companies, as well as the APUC staff and MAPCO were parties. Costs incurred in several other dockets were allocated, but those facts are not significant here.

**4.** AS 42.05.151 provides:
  (a) The commission may adopt regulations, not inconsistent with the law, necessary or proper to exercise its powers and to perform its duties under this chapter.
  (b) The commission shall adopt regulations governing practice and procedure, consistent with due process of law, including the conduct of formal and informal investigations, pre-hearing conferences, hearings and proceedings, and the handling of procedural motions by a single commissioner.

because cost allocation is an "integral part of a proceeding" and, therefore, is part of the "procedure" of the commission. The APUC submits that AS 42.05.151 mandates adoption of procedural regulations but gives the APUC discretion to adopt substantive regulations. It argues that the regulations requested by the TAPS owners are substantive, not procedural.

■ The plain meaning of the statute supports the APUC's position that AS 42.-05.151(b) mandates only procedural regulations.[5] Subsection (b)'s requirement of "practice and procedure" regulations does not apply to all of the APUC's powers; if it did, subsection (a), authorizing the APUC to adopt other regulations at its discretion, would be superfluous. Examples of "practice and procedure" given in subsection (b) refer to procedural aspects of the APUC's responsibilities, not substantive guidelines. In addition, interpretation of subsection (b) to apply only to procedural regulations is consistent with our interpretation of a similar statute, AS 42.07.141. In *Mukluk Freight Lines v. Nabors Alaska Drilling*, 516 P.2d 408 (Alaska 1973), we held that AS 42.07.141, which authorizes rulemaking powers for the Alaska Transportation Commission that are similar to the APUC's, requires the adoption of procedural regulations. *See generally Sisters of Providence in Washington v. Department of Health and Social Services*, 648 P.2d 970 (Alaska 1982) (distinguishing between required procedural and required substantive regulations). Therefore, we hold that AS 42.05.-151(b) requires the adoption of procedural regulations only.

We must now determine whether the regulations the TAPS owners claim should have been adopted are procedural or substantive in nature. The often strained procedural/substantive dichotomy arises in various legal contexts, *e.g., Erie* doctrine,

choice of law and res judicata analyses. Here, however, we are not concerned with complicated issues of federal-state comity, full faith and credit, or the need for judicial economy. Rather, we only interpret a narrow provision in a statute intended to allow the state to recoup the costs of regulating the pipeline.

■ We note initially the fundamental distinctions between substantive and procedural law. Substantive law is "[t]hat part of law which creates, defines, and regulates rights." *Black's Law Dictionary* 1281 (5th ed. 1979). Procedural law is "that which prescribes method of enforcing rights or obtaining redress for their invasion." *Id.* at 1083. It is the "machinery for carrying on a suit." *Id.* These definitions, of course, only outline the poles of the substantive/procedural continuum. We must determine the boundary between these shadowy, often overlapping concepts in the context of the present case. We recognize that reasonable minds may differ over the exact location of the boundary. We do not believe that the legislature intended the APUC to be caught in a morass of legal niceties while distinguishing substantive from procedural. Neither do we believe that the legislature intended the APUC to spend all its time drafting regulations for any arguably procedural issue. Rather, to make most meaningful the legislature's broad grant of administrative discretion in AS 42.05.151(a), we must narrowly construe "procedural" as used in AS 42.05.151(b). Accordingly, unless the regulations requested by the owners were clearly procedural, we will find no abuse of discretion.[6]

■ We note that many of the APUC's then effective general procedural regulations governed the cost allocation proceedings. *See* 3 AAC 48.040—.160 (repealed in part, amended in part, June 29, 1984).

---

5. We independently interpret AS 42.05.151(b) without deference to the APUC's interpretation of the statute because the commission's expertise in statutory interpretation is no greater than our own. *Mukluk Freight Lines v. Nabors Alaska Drilling*, 516 P.2d 408, 411–12 (Alaska 1973).

6. Of course, we do not mean that the APUC might not have best exercised its discretion by issuing specific regulations governing the narrow issues raised by cost allocation proceedings. *See infra* note 10. Indeed, after the hearings at issue here, the APUC did issue regulations to govern future proceedings. 3 AAC 48.157 (enacted 1984).

Further regulations [7] governed such clearly procedural issues as appearances, 3 ACC 43.040, testimony and evidence, *id.* at .070, procedural motions, *id.* at .140, reconsideration, *id.* at .150, and discovery, *id.* at .160.[8] Thus, the cost allocation proceedings were not completely unregulated; rather, the APUC had arguably met the mandate of AS 42.05.151(b) by its general procedural regulations.

The APUC properly concluded that the owners' requested regulations did not govern clearly procedural issues. Rather, since not clearly procedural, they fell within the broad ambit of administrative discretion over substantive matters. The owners claim that regulations should have been adopted to define "costs," "parties," "consultants" and other terms in AS 42.05.-151(b). They also contend that criteria for delineating, controlling and allocating costs should have been established by regulation. We believe, however, that the requested "definitions" and "criteria" involve more the APUC's right to recoupment of costs than its method of enforcing that right.

█ We also believe that the above described general procedural regulations adequately outlined the APUC's method of enforcing the substantive right to recoup costs. The owners, however, claim that regulations designating the burden and the standard of proof should also have been adopted. While questions concerning burdens and standards of proof are commonly considered to be procedural, *see, e.g.,* Restatement (Second) of Conflicts §§ 133, 135, this does not mean that the statute requires that these subjects be covered by a regulation. These subjects are covered by common law principles.[9] Our own rather comprehensive rules of civil procedure do not contain rules generally allocating burdens of proof or prescribing standards of proof. No matter how detailed rules of practice and procedure may be, there will always be questions left unanswered by them. We do not regard the APUC's failure to prescribe burdens and standards of proof as a violation of the command of AS 42.05.151(b) to "adopt regulations governing practice and procedure...." [10]

█ In AS 42.05.151(a), the legislature has expressly chosen to make substantive regulations discretionary. We have concluded that AS 42.05.151(b) does not require the regulations desired by the TAPS owners. Thus, substantive cost allocation regulations are required only to the extent necessary to satisfy due process.

B. *Due Process*

█ The owners contend that APUC's failure to adopt cost allocation regulations violated their right to due process as guaranteed under both the United States and Alaska constitutions. U.S. Const. amend. XIV; Alaska Const. art. I, § 1. Both the United States and Alaska constitutions require that deprivation of life, liberty or property be preceded by the due process of

7. Chapter 43 of Title three governed procedures before the APC. *See supra* text at note 2. The Act abolishing the APC and transfering its functions and powers to the APUC provided that APC regulations remained effective until superseded by APUC regulations. Ch. 110, § 18(a), SLA 1981. The APUC did not issue new pipeline regulations until June 29, 1984. Thus, the APC regulations were still effective at the time of these cost allocation proceedings.

8. *See also infra* note 10.

9. *See generally, State v. Decker,* 700 P.2d 483, 485 (Alaska 1985); *Morrow v. New Moon Homes,* 548 P.2d 279, 294 (Alaska 1976); *Skagway City School Board v. Davis,* 543 P.2d 218, 222 (Alaska 1975).

10. Effective after the date of the order applicable here, a regulation was adopted governing the allocation of costs. 3 AAC 48.157. It, however, does not contain information concerning burdens or standards of proof. At the time of the cost allocation which took place in this case, a number of the general regulations adopted by the APC, *see supra* note 7, were obviously applicable, although they did not address the questions of burden and standard of proof. *See, e.g.,* 3 AAC 43.040 (appearances), .060 (applications), .065 (public hearings on applications), .070 (testimony and evidence), .075 (hearings not initiated by formal complaint), .085 (form of pleadings), .095 (notice), .100 (default), .105 (postponement of hearing), .110 (continuances), .115 (consolidation of proceedings), .120 (conferences), .130 (briefs), .135 (oral argument), .140 (procedural motions), .145 (commission decisions), .150 (reconsideration), .160 (discovery), .165 (evidence rules) (all repealed 6/29/84).

law. Because the owners' assets are at stake, they are, of course, entitled to due process. The question remaining is what process is due and this in turn depends on the particular circumstances of the case. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 33 L.Ed.2d 484, 494 (1972); *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, 1236 (1961); *McMillan v. Anchorage Community Hospital,* 646 P.2d 857, 863–64 (Alaska 1982).

■■■ As a general rule, absent statutory restrictions and due process limitations, administrative agencies have the discretion to set policy by adjudication instead of rulemaking. *See, e.g., SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995, 2002 (1947); *see also NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 295, 94 S.Ct. 1757, 1772, 40 L.Ed.2d 134, 154 (1974); *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 765–66, 89 S.Ct. 1426, 1429, 22 L.Ed.2d 709, 714–15 (1969).[11] The process of making new law in the course of an administrative adjudication does not constitute a *per se* violation of due process.

■■■ While we endorse the judicial bridling of excessive administrative discretion by requiring guiding regulations, we will only do so to the extent necessary to assure a fair administrative process. Thus, we will not reverse an administrative adjudication on procedural due process grounds unless there exists an element of unfairness, vagueness or lack of notice or opportunity to be heard.

In *Sisters of Providence v. Department of Health and Social Services,* 648 P.2d 970 (Alaska 1982) we refused to invalidate a Department of Health and Social Services decision on the basis of the Department's failure to adopt required procedural regulations. The Department had adopted a conditional decision, and allowed for the submission of evidence and comments before the final decision was issued. Thus, the procedure used to determine a hospital's "certificate of need" was reasonable. 648 P.2d at 978. The procedure we sanctioned in *Sisters of Providence* was similar to that used by the APUC in the instant case.[12]

■■■ The adequacy of process does not depend on the advance adoption of standards. Rather, we must look to the entire set of safeguards provided in the particular proceeding. The owners had notice at the beginning of the proceeding that the APUC could allocate costs to them, as parties, AS 42.06.610, even though they did not know what the costs would include or how they would be allocated. In November 1982, the APUC issued its preliminary cost allocation order. The order identified each of the dockets in which allocable costs were expended, and for each docket specified the categories of expenditure, the amount expended and the parties involved. It described the considerations which guided the APUC's interpretation of the statutory directive to allocate costs "as is just under the circumstances." AS 42.06.610. It ex-

11. As the owners explain, there is a judicial trend to find agency adjudications violative of due process when administrative discretion is broad and there are no regulations to curtail it. 2 K. Davis, Administrative Law Treatise § 7.26, at 128 (2d ed. 1979). In fact, we have expressly endorsed this trend. *See, e.g., State v. O'Neill Investigations,* 609 P.2d 520, 533 n. 49 (Alaska 1980) (preferable for the attorney general to exercise his discretionary rulemaking power to fill in the interstices of the Alaska Unfair Trade Practices and Consumer Protection Act rather than to rely exclusively on adjudication); *Keystone Servs. v. Alaska Transp. Comm'n,* 568 P.2d 952, 956 n. 9 (Alaska 1977) (order of the Alaska Transportation Commission [ATC] stayed in part because the ATC had failed to promulgate regulations defining its permit requirements); *Mukluk Freight Lines,* 516 P.2d at 415 ("the promulgation of rules establishing administrative standards affords protection against arbitrary exercise of discretionary power" (footnote omitted)).

12. *Cf. Mukluk Freight Lines,* 516 P.2d 408. In *Mukluk Freight Lines,* the Alaska Transportation Commission had used a "modified procedure" in one particular proceeding, by making its decision on written submission without conducting an oral hearing or allowing cross-examination as was normally the course. We invalidated the order because the governing statute required procedural regulations, and because the participant had insufficient time to prepare written submissions, and thus was actually prejudiced by the agency's ad hoc determination of procedure. 516 P.2d at 414–15.

plained how and why the APUC assigned various proportions of the costs to the parties.[13] The order specified a procedure for objections, including an opportunity for the parties to audit the APUC's records. Finally, it calculated the costs per docket and the total owed by each party.

The owners did not challenge the rationale of the cost order in their petition for reconsideration. Instead, they challenged the entire order on the ground that regulations containing cost allocation standards are required before the APUC can allocate costs. They further claimed that certain costs were unreasonable. In its final cost order, the APUC addressed the owners' substantive objections and granted partial relief.

■ On appeal the owners claim that the statutory cost provision of AS 42.06.610 is vague, and that the lack of published regulations interpreting that provision deprived them of adequate notice of their potential liability. Even assuming, arguendo, that the owners had no notice of the APUC's cost allocation policy during most of the six years in which the costs were expended, they received notice and an opportunity to object to the APUC's policy and decision before the allocation order became final. Since the APUC conducted the investigation, the owners had no control over the costs incurred. The only limit to the owners' liability was the reasonableness of the allocation decision. Thus, lack of notice of the APUC's policy could not have harmed the owners.

■ The owners also contend that they were deprived of due process because they had no notice of the burden of proof until the final cost allocation order and never had notice of the standard of proof. These contentions lack merit. The staff of the APUC had the initial burden to describe and document its costs for the Commission. The Commission tentatively determined that certain costs were reasonably incurred and assignable, and issued its initial cost allocation order. The owners then audited the APUC records and filed a motion for reconsideration. At this stage it was the owners' burden to show that the initial allocation was unreasonable or improper.[14] When the owners showed that certain costs were unreasonable, or that supporting documentation for costs was unavailable, the APUC removed those costs from the allocation order.

■ The owners next contend that without interpretative regulations, AS 42.-06.610 is so vague that it encourages arbitrary and discriminatory allocation decisions. We disagree. The APUC provided adequate procedures to avoid arbitrariness. The APUC articulated the reasoning behind its decision, laid open its books for the parties to audit, and then responded to objections made by the parties.

■ The owners claim also that the APUC's cost records were sloppy and unsubstantiated. They assert that inadequate record keeping deprived them of a fair opportunity to object. Again, we disagree. The records adequately provided opportunities for objection. Indeed, the owners' detailed audit would not have been possible had the records been so inadequate.

■ The owners submit that the cost allocation procedure deprived them of meaningful judicial review of the APUC's decision. We disagree. The APUC's explanation of the reasoning behind its decision and its identification of the nature and amounts of the costs provide an ample record for judicial review.

---

**13.** The order explained that it was "just" that the owners bear the burden, because the "cost-causer should be the cost-payer," and because the owners could pass the costs on to their customers. Further, it reasoned that the other parties should not pay a large share of the cost, because this would discourage their participation in such proceedings.

**14.** A party in an administrative proceeding can assume that preponderance of the evidence is the standard of proof unless otherwise stated. No one contends that any different standard applied here. Since this is the easiest standard the owners could have been expected to meet, the lack of explicit notification of the standard did not harm them.

▄ The owners maintain that the cost allocation procedure violates a policy favoring public and legislative oversight of the APUC's rulemaking process. We disagree. While rulemaking allows more public participation than does adjudication, no due process violation necessarily occurs because an agency chooses the less participatory procedure.

▄ Finally, the owners contend that the APUC is biased in allocating costs because it recoups its own costs by allocating them to others. We disagree. The right to an impartial decision maker is basic to a guarantee of due process. *In re Robson*, 575 P.2d 771, 774 (Alaska 1978). *See Storrs v. Lutheran Hospitals and Homes Society of America*, 609 P.2d 24, 28 n. 12 (Alaska 1980). Most courts, however, accept that the merger of investigative and executive responsibilities with adjudication does not violate federal due process if institutional safeguards exist against the abuse of unchecked administrative discretion. *See Withrow v. Larkin*, 421 U.S. 35, 52, 95 S.Ct. 1456, 1467, 43 L.Ed.2d 712, 726 (1975); *Matter of Johnston*, 99 Wash.2d 466, 663 P.2d 457, 463 (1983); *Tweedy v. Oklahoma Bar Association*, 624 P.2d 1049, 1052–53 (Okla.1981). We see no reason to provide broader due process protection under the Alaska Constitution in this instance. We conclude that the dual role of the APUC as both administrator of its own budget and adjudicator of costs does not violate state due process if sufficient safeguards exist against APUC's discretion. In this case,

the APUC's issuance of a reasoned decision explaining its cost allocation was a sufficient safeguard against the APUC's abuse of discretion. We can adequately check the APUC's exercise of discretion by reviewing a decision setting forth the agency's factual premises and substantive considerations.

▄ We conclude that the APUC's failure to adopt cost allocation regulations did not violate the owners' right to due process under the United States or Alaska constitutions.

### III. ALLOCATION OF COSTS INCURRED IN FERC TAPS PROCEEDING IS NOT PERMITTED

AS 42.06.610 [15] authorizes the APUC to allocate the costs of a proceeding "held under this chapter." The owners claim that the APUC exceeded the authority of AS 42.06.610 by allocating costs incurred in proceedings held by the FERC.[16] The APUC claims that any action taken by the APUC is a proceeding "held under this chapter." Since AS 42.06.140(a)(10) [17] authorizes the APUC to assist the Department of Law ("Department") in FERC hearings, the APUC claims that its assistance to the Department are costs allocable as proceedings "under this chapter."

▄ We agree with the owners that AS 42.06.610 does not authorize the APUC to allocate costs incurred in any proceedings other than those which are conducted by

---

15. As 42.06.610(a) provides as follows:
   During a proceeding held under this chapter, the commission shall allocate the costs of the hearing or investigation among the parties, including the commission, as is just under the circumstances. The costs allocated may include the costs of any time devoted to investigations or hearings by hired consultants, whether or not the consultants appear as witnesses or participants.
   AS 42.06.610 was amended in 1981 to allow cost allocation during a proceeding as well as at the end of a proceeding. The definition of allocable costs, however, remained unchanged. Ch. 27, § 3, SLA 1981.

16. The FERC has regulatory jurisdiction over interstate rates. The APUC and the FERC con-

ducted joint hearings regarding the TAPS tariffs. *See supra* note 3, ("The fifth one ..."). The APUC also defended against a complaint by Sohio before the FERC that challenged the APUC's jurisdiction to conduct its investigations. Docket P–77–9; *see supra* note 3 ("The third one ...").

17. AS 42.06.140(a)(10) states:
   [The APUC] shall provide all reasonable assistance to the Department of Law in intervening in, offering evidence in, and participating in proceedings involving a pipeline carrier or affiliated interest and affecting the interests of the state, before an officer, department, board, commission or court of another state or the United States.

the APUC either solely or concurrently. Pursuant to AS 42.06.610, the APUC is authorized to allocate costs of a proceeding "held under this chapter." The only proceedings "held under this chapter" are those conducted by the APUC either alone or in conjunction with another regulatory body. In proceedings not held by the APUC, only the governmental body holding the proceeding is authorized to allocate the costs, not the APUC. Moreover, in a proceeding other than its own, the APUC may be acting as an advocate of the state's interests as a taxing authority or owner of part of the oil which is transported rather than as a regulator. We do not believe that AS 42.06.610 was intended to allow the APUC to allocate advocacy costs to opposing parties where it appeared as a party in an adversarial proceeding before a different regulatory authority.

In this case, the APUC allocated costs associated with two separate FERC proceedings. First, the APUC allocated costs for defending Sohio's complaint before the FERC in Docket P–77–9.[18] None of these costs are properly allocable since they were incurred solely in a proceeding before the FERC.

Second, pursuant to AS 42.06.-140(a)(10), the APUC aided the Department in its presentation to the FERC in the concurrent FERC TAPS proceeding.[19] The APUC claims that it saved costs by obtaining information from the Department in exchange for aid its consultants lent to the Department. The APUC also claims that this aid to the Department should be treated like a cost of its own proceeding, which

would otherwise have been incurred. This argument lacks statutory support. We hold that the APUC exceeded its statutory authority in allocating costs incurred *solely* in aiding the Department in the FERC TAPS proceeding.[20]

We recognize that economies benefitting all parties resulted from the coordinated efforts of the APUC staff and consultants, the Department, and the FERC. The APUC may allocate those costs that represented the expenses of developing the work product necessary for its own investigation. Its decision to share with the Department the fruits of the APUC's own proceedings will not prevent such allocation; they remain the costs of proceedings "held under this chapter." What the APUC may not allocate, however, are the additional costs of preparing its work product for use by the Department of Law in advancing the nonregulatory interests of the state in the FERC proceeding or in any other proceeding not its own. It may also not allocate those specific cost items, such as fees for special counsel or consultants incurred *solely* to assist the Department in its FERC appearance or submissions.

## IV. ALLOCATION OF LEGAL FEES

The APUC contracted with two attorneys, Terry F. Lenzner and Terry W. Bird, to provide services to the Commission. Before the APUC, the owners objected to the allocation of those portions of the Lenzner and Bird fees expended on FERC work.[21] On appeal, they challenge for the first time the entirety of these fees on several new grounds.[22]

---

**18.** *See supra* note 3. These costs totalled $35,-921.33.

**19.** *See supra* note 3.

**20.** The parties dispute whether the APUC actually did allocate such costs. On appeal, the APUC claims that it did not allocate costs incurred strictly in preparing for the FERC TAPS proceeding. However, in its final cost allocation order, the APUC stated that it did not need to determine whether it allocated costs spent strictly on the federal proceeding because it believed it had authority to do so.

**21.** To the extent that the APUC allocated cost items exclusively attributable to the FERC hearings we agree with the TAPS owners' objection. Thus, we reverse and remand on this issue for reallocation by the APUC. *See supra* section III.

**22.** As a general rule, we will not consider arguments never raised before the trial court. *Williams v. Alyeska Pipeline Serv. Co.*, 650 P.2d 343, 351 (Alaska 1982). We agree with the APUC that this same rule should apply to arguments never presented to an agency whose decision is appealed. However, application of the rule presupposes an opportunity to present objections to

Former AS 42.06.110 (repealed 1981)[23] provided that the attorney general is both legal counsel for the APUC and, under certain circumstances, the representative of the public interest in commission proceedings. It further provided that the APUC might employ temporary legal counsel from time to time in proceedings before the Commission. The TAPS owners object to the payments made to Lenzner and Bird for their work as "special counsel" for the APUC on the ground that their work took a long time and was, therefore, not temporary. This argument lacks merit. However long "temporary" may be, certainly it is as long as the proceeding for which the attorney was hired to represent the APUC. Requiring the APUC to substitute another "temporary" counsel midstream in a proceeding would be absurd.

We also reject the owners' contention that AS 42.06.610[24] does not authorize the allocation of attorney's fees. Pursuant to AS 42.06.610, the Commission is authorized to allocate the "costs" of the proceeding. The statute provides that "costs" include consultants' fees, but it nowhere excludes attorney's fees. When the legislature uses the term costs, it often intends to include attorney's fees. *See, e.g.,* AS 09.-60.010. The inclusion of attorney's fees in the "costs" allocable in AS 42.06.610 is consistent both with the apparent intent of the legislature to allow the APUC to recoup its costs of regulation, and with AS 42.05.141(1) which provides that the powers of the APUC shall be liberally construed to accomplish its stated purposes. Thus, we hold that AS 42.06.610 authorizes the APUC to allocate the costs incurred in hiring temporary legal counsel for a particular proceeding.[25] In sum, we affirm the APUC's allocation of all fees paid to Lenzner and Bird that were not solely expended on the FERC TAPS proceeding to advance the state's nonregulatory interests.

## V. INTERSTATE COMMERCE

The owners argue that the APUC cost allocation order violates the Commerce Clause of the United States Constitution, U.S. Const. art. I, § 8, both because some of the costs allocated are costs of advocating the state's position in the FERC TAPS proceeding, and because some of the costs allocated were not purely for the regulation of the owners. We need not decide whether the allocation of costs relating to the FERC TAPS proceedings violates the Commerce Clause, because we hold today that such cost allocation is invalid on statutory grounds.

The owners claim that some of the costs expended in the APUC proceeding were for intrastate regulation of the oil industry as a whole and not purely for the regulation of the owners. Even assuming arguendo that some of the costs expended were for intrastate regulation as a whole, the owners have presented no support for their claim that this creates an undue burden on interstate commerce. Therefore, we reject this contention.

We REVERSE the APUC cost allocation order on the ground that the APUC had no authority to allocate costs incurred in Docket P–77–9, which involved a proceeding solely conducted by FERC and because the APUC erred in refusing to

the agency before a decision is rendered by that agency. In this case, the owners had no opportunity to raise their arguments before the initial APUC cost allocation order was issued. Once the order was issued, they had an opportunity to object in the form of a motion for reconsideration. AS 44.62.540. AS 44.62.560, made applicable by AS 42.06.480, provides that "[t]he right to appeal is not affected by the failure to seek reconsideration before the agency." Thus, although the owners did seek reconsideration before the APUC, they did not waive issues on appeal by failing to raise them at that point.

Thus, they are not barred from raising those issues now.

**23.** We determine the APUC's authority to hire legal counsel and consultants by applying the statutes extant at the time these activities occurred.

**24.** *See supra* note 10.

**25.** By our holding, it is unnecessary for us to inquire into whether the APUC failed to maximize state personnel as required by former AS 42.06.120(b) (repealed 1981; *see supra* note 23).

separate allocable from nonallocable costs incurred in connection with the concurrently conducted FERC TAPS proceedings. We REMAND the order for reallocation consistent with this opinion. We AFFIRM the APUC's order in all other respects.